DECISION
{¶ 1} American National Can Company filed this action in mandamus, seeking a writ to compel the Industrial Commission of Ohio ("commission") to vacate its order awarding wage loss compensation to William A. Klemens. *Page 2 
 {¶ 2} In accord with the local rules, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated to the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision which contains detailed findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate's decision includes a recommendation that we deny the requested relief.
 {¶ 3} No party has filed objections to the magistrate's decision. The case is now before the court for review.
 {¶ 4} No error of law or fact is present on the face of the magistrate's decision. We therefore adopt the findings of fact and conclusions of law contained in the magistrate's decision. As a result, we deny the request for a writ of mandamus.
Writ of mandamus denied.
SADLER, P.J., and DESHLER, J., concur.
DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution. *Page 3 
 APPENDIX A MAGISTRATE'S DECISION {¶ 5} In this original action, relator, American National Can Company, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding R.C. 4123.56(B) wage loss compensation to respondent *Page 4 
William A. Klemens ("claimant") beginning September 27, 2003, and to enter an order denying wage loss compensation.
Findings of Fact: {¶ 6} 1. On July 1, 1994, claimant sustained an industrial injury while employed as a "Laborer — Bag Machine Operator" for relator, a self-insured employer under Ohio's workers' compensation laws. On that date, while pulling a stuck sump pump, claimant fell on his right knee. He continued working but with increasing pain over the next several days.
 {¶ 7} 2. The industrial claim is allowed for "possible torn meniscus right knee; torn medial meniscus right knee medial femoral condyle contusion," and is assigned claim number L264449-22.
 {¶ 8} 3. On August 30, 2001, claimant's treating physician, William J. Petersilge, M.D., wrote:
 Mr. Klemens returns today for follow up examination. His primary concern is that he does not feel that he can return to work on the scheduled [return to work] date. I had a discussion with Mr. Klemens and his mother concerning this. He is still using a cane to ambulate, however, clinically he has no swelling. He maintains 115 degrees of knee flexion but does have some quadriceps atrophy.
 Plan: I have recommended that we try another month of physical therapy and will continue with left lifts. Final return to work date will be 10-13-2001. Beyond that point I think that he needs to anticipate either returning to work or making a job change. * * *
 {¶ 9} 4. On October 4, 2001, Dr. Petersilge wrote:
 Mr. Klemens returns today for follow up. He is actually better walking better than I have ever seen him walk, using no cane or assistive devices. He maintains zero to 120 degrees of *Page 5 
flexion. His biggest concern is the fact that he still has an effusion, which has persisted. The effusion worsens through the day. He really does not have much in the way of patellofemoral or lateral compartment inflammation, which makes me think that it is very unlikely that this presents infection but more just a continued inflammatory process.
 At this point I have recommended that he use a knee sleeve. I don't foresee his knee pain changing significantly in the future, and thus I have suggested that he return to work as we had planned on October 15, 2001. If this does not work out, he may need to seek a job change. * * *
 {¶ 10} 5. On September 11, 2002, claimant's treating physician, K.L. Stearns, M.D., wrote:
 He is still having problems with intermittent swelling in the knee after a lot of physical activity. He has a small effusion today but says he had to do a fire drill and go down some steps and says his knee really swelled last week. The workup for infection and cultures were negative. I did obtain another set of x-rays today and it appears that there is actually a little bit of an offset between the femoral and tibial components which may be overstressing the poly in the tibial tray. I did discuss this with him. I want him to track down his original films and compare them which would indicate if there is any malalignment or a progressive change which would indicate loosening. I want him to put his unloader brace back on to unload the medial side. I gave him some more Bextra. I told him if it didn't calm down and it did not appear to be loose from serial x-rays I would consider scoping it. He'll follow-up when he gets his films.
 {¶ 11} 6. On November 12, 2002, claimant was examined by Sheldon Kaffen, M.D., who reported:
 The claimant is currently working full time doing clerical work which does not require him to be on his feet for any length of time. Restrictions include no prolonged weight bearing, no frequent stair climbing, no squatting or kneeling, no working at heights. *Page 6 
 {¶ 12} 7. On July 10, 2003, Dr. Stearns wrote:
 It is my opinion, to a reasonable degree of medical certainty, that William Klemens can no longer perform the type of manual/machinery work, standing 70 to 80% of the time during an eight hour shift as a result of his knee injury suffered on July 1, 1994. At this time he is only capable of performing more sedentary, desk type work.
 {¶ 13} 8. On June 24, 2004, Dr. Stearns completed form C-140. On the form, he indicated by checkmark that claimant could never lift or carry above 20 pounds. Dr. Stearns indicated that the restrictions are permanent.
 {¶ 14} 9. On April 13, 2005, Dr. Stearns wrote to relator's counsel, stating: "The opinions set froth in my previous medical report on Mr. Klemens remain unchanged at this time."
 {¶ 15} 10. On March 9, 2006, Dr. Stearns wrote to relator's counsel, stating: "I received your correspondence regarding William Klemens. After reviewing the provided documents, all opinions previously set forth by me in regards to Mr. Klemens remain unchanged."
 {¶ 16} 11. On May 16, 2006, Dr. Petersilge wrote:
 This letter is concerning Mr. William A. Klemens. Mr. Klemens has been treated by me in the past, over the period of 1998 through October of 2001. I had been seeing him for problems regarding his right knee injury from July 1, 1994, when he was employed with the American National Can Company. During that period of time, I witnessed progressive degenerative changes in his right knee. I had recommended beginning in 2001 that Mr. Klemens seek another form of employment, as working in an industrial occupation where he stands on his feet was becoming increasingly painful and symptomatic. It was my recommendation that he consider a job change to a seated position and undergo appropriate retraining to allow him to do that. I did not feel that given the progression of his degenerative changes that he was going to be able to *Page 7 
continue to work in a manual labor job for a significant period of time beyond that point.
 It is my understanding that in March of 2002 that he eventually took my advice and had a job change, which I feel is appropriate under the circumstances, and I would support from my point of view his medical need to make this change. I would hope that Workers' Compensation would be able to compensate him for the difference in wages.
 {¶ 17} 12. Earlier, on September 27, 2005, claimant filed an application for wage loss compensation on form C-140. On the form, claimant stated that he was employed by relator from June 25, 1990 to March 15, 2002 as a "Laborer — Bag Machine Operator."
 {¶ 18} The C-140 form asks the applicant to give his "Reason for Leaving" his former job. Claimant explained: "Company closed after I returned to work on restricted basis from surgery for allowed condition. Allowed condition prevented me from obtaining another position doing similar work."
 {¶ 19} On the C-140, claimant indicates that he began employment with Keybank USA on March 18, 2002, and that he began his employment there as an "End of Term Lease Specialist." Claimant also indicated that he was earning $16.95 per hour while employed with relator, but he earned only $12.26 per hour when he began with Keybank USA. Claimant indicated that he was requesting working wage loss compensation beginning March 18, 2002.
 {¶ 20} 13. Following an April 26, 2006 hearing, a district hearing officer ("DHO") issued an order denying claimant's wage loss application. The DHO's order states:
 It is the order of the District Hearing Officer that the C-140, filed 9-27-05, is denied. *Page 8 
 The request for wage loss from 3-18-02, and continuing, is denied. First, wage loss from 3-18-02 through 9-26-03 is barred by the two year statute of limitations. Second, there is no evidence contemporaneous to the March 2002 time claimant left the employment of the instant employer as to the reason behind claimant's departure. The Hearing Officer finds that there is conflicting evidence as to the plant closing versus some other reason.
 Third, the Hearing Officer finds that claimant has failed to establish a good faith job search, or any job search documentation, only that claimant took a new job on 3-18-02.
 Fourth, there is no medical evidence contemporaneous to the time claimant left the instant employer supporting the fact that claimant could no longer do the job there. And finally, the medical evidence submitted is insufficient to support the wage loss application in accordance with the rules.
 {¶ 21} 14. Claimant administratively appealed the DHO's order of April 26, 2006.
 {¶ 22} 15. Following a June 15, 2006 hearing, a staff hearing officer ("SHO") issued an order that, without so stating, apparently vacates the DHO's order of April 26, 2006. The SHO's order states:
 The Staff Hearing Officer finds that claimant left his employment with the American National Can (Pechaty) in March of 2002. The employer acknowledged at hearing (06/15/2006) that the plant at which claimant worked was closed in March of 2002. Even were claimant to have left his employment immediately prior to the plant closure in March of 2002, the Staff Hearing Officer does not find that such an action amounts to one which can be construed as a voluntary limitation on subsequent earnings and, therefore, a bar to payment of wage loss compensation.
 Medical records on file as early as the 08/30/2001 office note of Dr. Petersilge make mention of the doctor's opinion that claimant will need to seek out sedentary employment if his knee problems continue to worsen. Claimant's right knee problem did continue and he ultimately left American National Can/Plechaty for this reason and took a sedentary job with Key Corp on or about 03/18/2002. The Staff Hearing Officer *Page 9 
does not find that a gap of several days (last worked for American National Can/Plechaty on 03/15/2002; started job with Key Corp on 03/18/2002) is indicative of a deficient job search or a voluntary limitation of earnings. To the contrary, claimant's actions resulted in an almost seamless transition to less strenuous, sedentary employment that was consistent with what Dr. Petersilge had suggested months before.
 Subsequent medical records, notes and reports on file (for example, Dr. Stearn's note of 09/11/2002; Dr. Kaffen's independent medical examination of 11/15/2002; Dr. Stearn's note of 07/10/2003; Dr. Stearn's 06/24/2004 C-140; Dr. Stearn's note of 04/13/2005; Dr. Stearn's letter of 03/09/2006; Dr. Petersilge's note of 05/16/2006), all document and confirm that claimant's restriction to sedentary employment continued from March 2002 forward to at least May 2006.
 The Staff Hearing Officer finds that consideration of payment of wage loss compensation for the period 03/18/2002 to 09/26/2003 is barred by two year statute of limitations, as the C-140 wage loss application was not filed until 09/27/2005. The Staff Hearing Officer orders working wage loss compensation paid (for those periods hereinafter cited during which a mathematical loss of earnings is demonstrated) for the periods 09/27/2003 to 09/30/2003 (received temporary total disability compensation for the period 10/01/2003 to 11/17/2003), 11/18/2003 to 03/13/2005 (received temporary total disability compensation for the period 03/14/2005 to 05/08/2005) and from 05/09/2005 to 05/27/2006. Further wage loss compensation beyond 05/27/2006 is to be paid upon submission of ongoing earnings records as well as periodic supporting medical evidence. The wage loss compensation awarded herein is subject to statutory limitations as to weekly and overall maximum benefit amounts.
 {¶ 23} 16. On August 19, 2006, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of June 15, 2006.
 {¶ 24} 17. On November 30, 2006, relator, American National Can Company, filed this mandamus action. *Page 10 
Conclusions of Law: {¶ 25} The issue is whether the May 16, 2006 report of Dr. Petersilge constitutes some evidence that claimant's March 2002 job change was related to the allowed conditions of the industrial claim when Dr. Petersilge had repeatedly examined and treated claimant prior to the job change.
 {¶ 26} Finding that the May 16, 2006 report of Dr. Petersilge does constitute some evidence upon which the commission can and did rely to award wage loss compensation, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 27} A medical ability to return to the former position of employment precludes R.C. 4123.56(B) wage loss compensation. State exrel. Chora v. Indus. Comm. (1996), 74 Ohio St.3d 238; State ex rel.Pickett v. Indus. Comm. (1996), 74 Ohio St.3d 679. A medical inability to secure work comparable in pay to the former position of employment is a prerequisite to obtaining wage loss compensation. State ex rel.Frederick v. Licking Cty. Dept. of Human Serv. (1998),82 Ohio St.3d 227, 230.
 {¶ 28} Ordinarily, a doctor cannot offer an opinion on a claimant's extent of disability for a period that precedes his examination of the claimant. State ex rel. Foor v. Rockwell Internatl. (1997),78 Ohio St.3d 396, 399. However, an examining doctor can retrospectively opine on a claimant's extent of disability if the doctor reviews all the relevant medical evidence generated prior to the date of examination.State ex rel. Bowie v. Greater Cleveland Regional Transit Auth. (1996),75 Ohio St.3d 458.
 {¶ 29} Here, Dr. Petersilge examined claimant on August 30 and October 4, 2001, and rendered reports or office notes addressing claimant's extent of disability. *Page 11 
Those two examinations predate claimant's March 2002 job change that underlies his claim for wage loss compensation.
 {¶ 30} More than five years later, on May 16, 2006, Dr. Petersilge issued a report clarifying his opinion as to claimant's extent of disability in October 2001.
 {¶ 31} Relator contends that Dr. Petersilge's May 16, 2006 report cannot constitute evidence of claimant's extent of disability at the time of the March 2002 job change simply because the report post-dates the date of the job change. The magistrate disagrees.
 {¶ 32} It is well-established that an examining physician may clarify previous statements or reports and that the commission is required to credit the subsequent clarification. State ex rel. Petronio v. Indus.Comm. (1999), 84 Ohio St.3d 427.
 {¶ 33} Here, on May 16, 2006, Dr. Petersilge clarified his opinion as to claimant's extent of disability at the time of his examinations in 2001. Thus, Dr. Petersilge's May 16, 2006 report relates back to the August 30, 2001 office note that the commission relied upon to support claimant's medical status at the time of his March 2002 job change.
 {¶ 34} In his May 16, 2006 report, Dr. Petersilge clarifies that it was his opinion in 2001 that claimant was not "going to be able to continue to work in a manual labor job for a significant period of time beyond that point."
 {¶ 35} Clearly, Dr. Petersilge's May 16, 2006 report provides the commission with some evidence that, as of March 2002, claimant was no longer medically able to remain at his former position of employment or to secure work comparable in pay to his former position of employment. *Page 12 
 {¶ 36} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1